Hunter *v.* St. Mary's Natural Gas Co. (et al., Appellant).

Argued April 15, 1936.

Before Keller, P. J., Cunning-
ham, Baldrige, Stadtfeld, Parker, James and Rhodes,
JJ.

*Murray J. Jordan,* with him *Fred J. Jordan,* for ap-
pellant.

*John E. Evans, Jr.,* of *Margiotti, Pugliese, Evans &
Reid,* for appellee.

Opinion by James, J., July 10, 1936:

Claimant filed a petition on behalf of herself, as
widow, and her children, for compensation for the
death of her husband, which, after hearing before a
referee, was allowed. On appeal, the Workmen's Com-
pensation Board reversed the referee and returned the
record for further hearing on the question of causation
between the alleged accident and the ultimate death.
The referee, before whom the hearing was held, having
died, an order was made remanding the record to an-

other referee, who, after hearing, found as a fact that decedent's death was the result of natural causes, and dismissed the petition. Claimant thereupon appealed to the board and filed a petition for a rehearing. The rehearing was denied by the board, but it remanded the, record to the referee with directions that he appoint three impartial physicians. This was done and their testimony was taken; thereupon, the referee reversed his former position and made an award in favor of the claimant, which, on appeal to the Workmen's Compensation board, was affirmed, and later affirmed by the court of common pleas. From the judgment entered on the award, this appeal was filed.

Appellant presents two questions: First, that the findings of fact were based on hearsay testimony not part of the res gestae; and second, there was not sufficient testimony, in law, to establish from what cause death occurred.

A complete history of the facts is found in the referee's second and third findings of fact, in the last award, as follows: "Second: That Joseph Hunter, deceased, was employed as foreman by the St. Marys Natural Gas Company, Emporium, Cameron County, Pa., on December 17, 1932; that he was apparently a good worker, and on the above date he went to the home of Mrs. Bissig, Emporium, Pa., to make an adjustment on a gas heater in the cellar; that the decedent had an abhorrence for dogs; that a red bone hound, same being a puppy, weighing about fifty pounds, owned by the Bissig family, was put out of doors in order that the decedent could enter the cellar to make the necessary adjustment; that during the time that the decedent was working in the cellar, Mrs. Bissig or her uncle was present with the exception of five minutes, during which time it seems that the dog entered and left the cellar, since no one except possibly the decedent saw the dog; that shortly thereafter the uncle re-

turned to the cellar and found the decedent complaining of intense headache and nausea, the dog having jumped on the back of the decedent although the dog did not injure him; that this occurred between 2:00 and 2:15 P. M.; that the decedent vomited, stopped work immediately, and returned from the house to his office; that he was not seen again until he was discovered dead in his chair at the Gas Office around 7:00 P. M., having apparently been dead several hours; that in the waste basket beside him was found some material which he had vomited; that there were no noxious gases in the office; that no autopsy was held.

"Third: That the decedent was aged 38 years, and although Mr. Hunter was considered healthy there is no evidence supporting that contention; and that, your referee believes and so finds that the decedent's fear of canines, and the chief symptoms of severe headache accompanied by nausea and vomiting immediately following the fright he sustained when the dog jumped on his back caused a cerebral hemorrhage which terminated in his death a few hours later."

The evidence upon which the referee relied to establish the accident, and which appellant contends is hearsay and not part of the res gestae, is found in the testimony of Mrs. Bissig and Samuel Robinson, her uncle. Mrs. Bissig testified in part as follows: "......I had been down there talking to him all the time he worked, and when I went up again I stayed up. Then my uncle came up and said to me, 'that man is sick in the cellar.' I went down and said, 'what is wrong'? He said, 'the dog jumped on me, I am a fool about dogs, but I can't help it.' I said, 'did he bite you'? And he said, 'no, but he jumped on me and I am as weak as a cat.' 1 had a rocking chair there and I said, 'why don't you come and sit down'? He was holding his head and wiping his face with his handkerchief. He said, 'my head aches awful.' ...... He sat there a while and

said, 'my head aches something terrible.' I said, 'will you take another aspirin'? He said, 'I just took one, I only took one at first.' I said, 'will you come up and lay down on the davenport'? He said, 'no, it is cooler here.' He sat there and complained about his head all the time. Finally he got up and went to working on the tank. I said, 'if you are sick you don't need to fix it today.' He got up and went upstairs......" Samuel Robinson testified in part as follows: "A. I passed him with a scuttle of coal and went out and when I came in he was over in the corner, Mr. Hunter was at the gas tank and he was down with his head in his hands and he said, 'my head is cracking open, I am afraid of that dog.' ...... Q. Did he say to you that the dog was in the cellar? A. He said that the dog jumped on his back. I didn't see him, he must have come out the other way. He said to me, 'I am afraid of the dog, scared to death of him.'"

" 'To be admissible as part of the res gestae, declarations must be the spontaneous utterances accompanying or immediately succeeding or immediately preceding the act in question, so near in point of time and place as to be in reality a part of it, and not the designed statements of the actors, nor the recital of a past event. In other words, where the declarations 'are made under such circumstances as will raise the reasonable presumption that they are the spontaneous utterances of thoughts created by, or springing out of, the transaction itself, and as soon thereafter as to exclude the presumption that they are the result of premeditation and design, they will be admissible as part of the res gestae': Riley v. Carnegie Steel Co., 276 Pa. 82, 84. [Guyer v. Equitable Gas Co., 279 Pa. 5, 123 A. 590] ...... While the law does not fix a definite time within which the statements must be made in order that they may be received as part of the res gestae or as spontaneous utterances, it is well settled

that there must not be a break in continuity which affords time for reflection": McMahon v. E. G. Budd Mfg. Co., 108 Pa. Superior Ct. 235, 239, 240, 164 A. 850.

Statements by a person on going downstairs, as to what just occurred upstairs, or on entering a house as to what had just occurred outside, would be part of the res gestae. In either case the declaration would be an undesigned incident of the occurrence and not the recital of a past event: Lantz v. Central Pa. Conf. M. E. Church, 104 Pa. Superior Ct. 35, 159 A. 57. The statements made by decedent, immediately succeeding the act of the dog jumping upon his back, so close in point of time, (not more than five minutes), and while he was still suffering from the fright, were such spontaneous utterances, springing from the accident itself, as to constitute the declarations part of the res gestae.

In the recent case of Hoffman v. Rhoads C. Co., 113 Pa. Superior Ct. 55, 56, 57, 172 A. 33, President Judge KELLER, said: "One's purely subjective emotions, the result of anger, grief, joy or other mental feeling, if unaccompanied by physical force or exertion, cannot be made the basis of a compensable accident under our Workmen's Compensation Law. There must be the *happening* of some undesigned, unforeseen, sudden or unexpected *occurrence,* some untoward or fortuitous *mishap* or *event* outside of the usual course of things ......and this is not satisfied by a merely subjective state of feeling, not the result of physical force or violence exerted either by the employee or from outside, resulting in the employee's injury or death. The consequences of such exertion may be external or internal, but physical force, violence or strain must be present." In Yunker v. W. Leechburg S. Co. et al., 109 Pa. Superior Ct. 220, 167 A. 443, we held that death due to a nervous (fear, fright, nervous excitement, pain or fear of pain) overload on a badly damaged heart, while decedent was about to undergo a minor operation for

the extraction of a splinter of steel, suffered in the course of his employment, was compensable. In the present case, the facts establish that the fright suffered by the decedent was not from the mere presence of the dog, but arose from the dog jumping upon his back; which in itself is an external physical force which constitutes the happening of an unexpected occurrence to bring the facts within the definition of an accident under our compensation act: Lacey v. Washburn & Williams Co., 309 Pa. 574, 164 A. 724. The amount of the physical force is not determinative of the question. If it was physical force to any degree or extent, and if supported by medical testimony, it was sufficient to establish the death resulted from an accident in the course of the employment.

Our examination of the record, and considering solely the testimony of the doctors called by the referee, establish that the finding of the referee as to the causation of death was fully warranted. Decedent on the day of accident was apparently in a normal and healthy condition, but from a medical standpoint, no one was familiar with his condition, and no post-mortem was performed. Two of the doctors called testified that fright alone could not cause death, while the third doctor was of the opinion that a normal vessel would not rupture under the circumstances. Dr. Schleiter testified, "I would infer he was suffering from some morbid condition in some portion of his body, most likely in the brain, which was precipitated—made worse—by this fright." Dr. Sullivan was of the opinion "this man evidently suffered from a cerebral hemorrhage due to a rupture of the very small artery in the brain"; and Dr. Mitchell testified, after a careful study of the testimony relative to his inspection, "it seems to me that the most logical cause of his death was a subarachnoid cerebral hemorrhage." Dr. Schleiter further testified: "Q. Doctor, from the history you got from this rec-

ord, and after considering all the testimony, whether or not it is your best professional opinion that the death of this decedent was most probably caused by the alleged fright he sustained from the red bone hound? A. It is my opinion that his death was not directly due to the fright. Q. Was it a marked contributory factor? A. I should say it was a marked contributory factor." Dr. Sullivan testified as follows: "Q. Doctor, is it your best professional opinion that the fright this man sustained caused the cerebral hemorrhage and the diagnosis you arrived at? A. I don't see anything else that would cause it." Dr. Mitchell testified: "Q. ......whether or not in your professional opinion the fright this man had was or was not a marked contributory factor in his death? A. I would feel, qualifying that by my statement already made, in the event he had some underlying physical disturbance already present in the blood vessels, that it was a considerable contributing factor. Q. You mean we have to assume that he had some underlying cause? A. I do, because if he was a perfectly healthy man from a pathological standpoint, I do not believe that fright could produce his death. Q. Couldn't you say the fright was a marked contributory factor in his death? A. Yes, I believe that."

The testimony establishes that decedent may have died of "arteriosclerosis or a cyst in the brain," as testified by Dr. Schleiter; "ruptured artery or thrombosis or an occlusion," as testified by Dr. Sullivan, or as testified by Dr. Mitchell, "some cerebral vascular insult." The referee adopted the opinion that death was caused by a cerebral hemorrhage. Regardless of which was the cause of the death, the testimony of the physicians was that the fright caused by being jumped upon by the dog was a marked contributory factor in producing the death. We have never required that the cause of death be established to a medical certainty, as that is

practically impossible, or that an autopsy be performed; all that is necessary is that, from a history of the case and the symptoms developed, in the professional opinion of the doctor, the condition caused by the accident contributed to the death of the injured person, though "such testimony need not be given in any particular words": Johnston v. Payne-Yost C. Co., 292 Pa. 509, 141 A. 481; Dopkin v. Phila. & Reading C. & I. Co., 296 Pa. 71, 145 A. 707. We are faced with the fact that the employee died from one of several causes, any of which, coupled with the fright, in the opinion of the doctors, was the cause of death.

Appellant argues that where a condition may be the result of one or more causes, for only one of which the defendant is liable, the burden is on the claimant to individuate that one as the positive cause, otherwise there can be no recovery: Gausman v. Pearson, 284 Pa. 348, 131 A. 247; Mudano v. Phila. R. T. Co., 289 Pa. 51, 137 A. 104. In Gausman v. Pearson, supra, from the testimony of the claimant's physician, it was quite as probable that the disability suffered was apoplectic as it was heat exhaustion. In Mudano v. Phila. R. T. Co., supra, one of the physicians for the plaintiff testified that the infection was due to the accident, while the other testified it came from an abrasion of the heel due to the rubbing of the shoe. But that is not the situation in the present case, as we can accept the testimony of any of the doctors and a cause of liability is established. It is immaterial from what condition deceased was suffering, whether a heart or a brain or an artery condition, if the fright caused by the dog jumping upon the deceased was a marked contributory factor in producing the death, the accident is compensable.

Judgment affirmed.